Paulette **MENDES–SILVA, Appellant,**

v.

**UNITED STATES of America, et al., Appellees.**

**No. 91–5247.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 9, 1992.

Decided Jan. 8, 1993.

George A. Borden, with whom Jeremiah C. Collins and Herbert N. Harmon, Washington, D.C., were on the brief, for appellant.

Mary McElroy Leach, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Jeffrey Axelrad and Gail K. Johnson, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before: MIKVA, Chief Judge; WALD and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Paulette Mendes–Silva appeals a district court decision granting summary judgment

in favor of the United States in an action brought pursuant to the Federal Tort Claims Act. The district court held that Ms. Mendes–Silva did not present sufficient scientific evidence to create a genuine issue of material fact as to whether the administration of yellow fever and smallpox vaccines on the same day caused Ms. Mendes–Silva's encephalomyelitis. Ms. Mendes–Silva claims error, arguing that the testimony of her two expert witnesses meets the standard of admissibility set out in Federal Rule of Evidence 703 and creates a genuine issue of fact as to causation. We agree that the district court erred, whether its decision rested on admissibility or sufficiency grounds, and we therefore reverse the grant of summary judgment and remand to the district court for further proceedings. However, because we do not find any basis for concluding that the district court judge inappropriately prejudged the issues or is otherwise unable to dispose fairly of this matter on remand, we deny Ms. Mendes–Silva's request to direct that the case be assigned to a new judge.

## I. BACKGROUND

Ms. Paulette Mendes–Silva brought suit against the United States under the Federal Tort Claims Act in 1989, after a private bill enabled her to maintain the suit despite the running of the limitations period, for injuries suffered allegedly as the result of receiving vaccinations for smallpox and yellow fever on the same day in 1963. Ms. Mendes–Silva received the yellow fever vaccination at a United States Public Health Service ("USPHS") outpatient clinic on March 12, 1963, after receiving the smallpox vaccination earlier that day at an unaffiliated private clinic. She had been working as an international conference interpreter, and she obtained the immunizations in preparation for an upcoming assignment in India. Ms. Mendes–Silva claims that the USPHS violated the then-prevailing standard of care by failing to inquire whether she had recently received other vaccinations, and by failing to disclose adequately both the risks of being vaccinated against the two diseases on the same day and the alternatives to such vaccination.

Although there is some discrepancy in the record regarding the exact date of the onset of her symptoms, Ms. Mendes–Silva began to experience severe headaches, loss of equilibrium, and difficulty in urinating within a few days of receiving the shots. Her condition worsened considerably over the next three days despite two visits to a local hospital for treatment. She was eventually admitted to Georgetown University Hospital in a semi-comatose state, with symptoms including severe fever, paralysis of the arms, legs, tongue and lips, incontinence, and extreme difficulty in breathing. Dr. Peter Bulle, Ms. Mendes–Silva's admitting physician at Georgetown, and one of her two expert witnesses in this suit, diagnosed her at the time as suffering from post-vaccinal encephalomyelitis—inflammation of the brain, spinal cord, and nervous system following injection of a vaccine. After some two months of treatment at Georgetown, Ms. Mendes–Silva continued to suffer from a broad array of symptoms. She was transferred to a rehabilitation facility in New York City, where she underwent intensive physical therapy for eight months before being released and relocating to London in January, 1964. She worked sporadically for a time, but ceased work completely in 1978 because of problems related to her illness. Many of these problems persist today, including double vision, difficulty in speaking, weakness in both legs, tremors, and frequent urinary infections.

In support of her claim against the government, Ms. Mendes–Silva designated two expert witnesses on the causation issue: Dr. Peter Bulle, a clinical pharmacologist and her admitting physician at Georgetown; and Dr. Charles Poser, a neurologist with expertise on the neurological effects of vaccines. Dr. Bulle based his conclusion that Ms. Mendes–Silva's encephalomyelitis was caused by the combination of the two vaccinations on several grounds. First, he concluded that the examinations and lab tests conducted while Ms. Mendes–Silva was at Georgetown eliminated all known non-vaccinal causes. Second, Dr. Bulle re-

lied on epidemiological studies regarding the effects of each of the two vaccines acting alone, which he concluded eliminated either of the vaccines individually as the cause of Ms. Mendes–Silva's illness. Third, the doctor noted studies suggesting that administration of two vaccines together, as opposed to one vaccine alone, increases the risk of encephalomyelitis. Finally, Dr. Bulle made repeated references to contemporaneous medical literature counseling against the concurrent administration of the two vaccines.

Dr. Poser also concluded that Ms. Mendes–Silva's encephalomyelitis was caused by the combined administration of the smallpox and yellow fever vaccines. Dr. Poser relied in part on three pieces of literature which he claimed warned against the simultaneous use of the vaccines—one of which reported an outbreak of neurological illnesses in West Africa during a period when the two vaccines were administered simultaneously. He also pointed to additional reports of similar disorders, which the government argues are unpersuasive because they involved only young children. In addition, Dr. Poser concluded that the risk produced by simultaneous administration exceeded the sum of the individual risks of the two vaccines administered separately. He posited that this "logarithmic" (rather than arithmetic) increase in risk was explained by a concept known as molecular mimicry.

After discovery was substantially complete, the district court granted the government's motion for summary judgment. *See Mendes–Silva v. United States*, No. 89–1131, slip op., 1991 WL 135090 (D.D.C. July 12, 1991) (*"Memorandum Opinion"*). The basis of the decision, however, is not entirely clear. Most of the district court's opinion discusses the weight of the evidence and the summary judgment standard. However, the court also appears to have been concerned with the scientific bases of the opinions of Drs. Bulle and Poser, and to have relied in part on this Court's discussion of admissibility of expert opinion in *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir.1988). Thus, we address both the admissibility and suffi-

ciency of the opinions offered by Ms. Mendes–Silva's experts.

## II. ANALYSIS

### A. *Admissibility of Expert Opinion*

The acceptable basis for expert opinion is governed by Federal Rule of Evidence 703, which provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

FED.R.EVID. 703. Rule 703 serves the twofold purpose of broadening the acceptable bases for expert testimony, by allowing testimony based on hearsay or otherwise inadmissible evidence, and avoiding the time-consuming process of introducing the mass of evidence that forms the basis of an expert opinion. *See Ambrosini v. Labarraque*, 966 F.2d 1464, 1466 (D.C.Cir.1992). As this Court made clear in *Ambrosini*, judicial inquiry under Rule 703 is limited to the *basis* of the expert opinion. The court must refrain from reviewing the *conclusions* of the expert " '[a]s long as the basic methodology employed to reach such a conclusion is sound....' " *Ambrosini*, 966 F.2d at 1467 (quoting *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984)). When the underlying basis or methods of an expert's opinion are of a type reasonably relied upon by the experts in the field, the court must allow the opinion to be assessed by the factfinder—even if the opinion reaches a novel conclusion. *Ambrosini*, 966 F.2d at 1467–68; *Ferebee*, 736 F.2d at 1535.

The opinions of Ms. Mendes–Silva's expert witnesses meet this standard for admissibility. Dr. Bulle formed his opinion based on examinations of Ms. Mendes–Silva conducted during her hospital stay at Georgetown, standard medical tests used to rule out alternative causes, non-epidemi-

ological studies indicating a correlation between combined administration of the vaccines and encephalomyelitis, and epidemiological studies which tended to rule out either vaccine individually as the cause of the illness. Dr. Poser relied on a number of case studies reporting illnesses similar to Ms. Mendes–Silva's. He suggested "molecular mimicry" theory—which had been discussed in an article in a reputable medical journal, but not yet widely accepted in the scientific community—as a possible explanation for the asserted increased risk of encephalitis caused by the simultaneous vaccinations. As the following review demonstrates, the criticisms identified by the district court simply do not establish that the bases for the opinions of Drs. Bulle and Poser are not of a type reasonably relied upon by experts in the field in forming opinions on medical causation.

The district court rejected as a reasonable basis some of the studies upon which Drs. Bulle and Poser relied because they involved "testing population[s that] share[ ] few traits with the plaintiff." *Memorandum Opinion* at 25. The court noted that in one study only one of the subjects was an adult, and all others were under six years old. Another study, involving infants, was labelled "totally inapposite to the case being decided as Ms. Mendes–Silva was 34 upon vaccination." *Id.* at 19. The district court pointed to no evidence, however, and we find none in the record, which suggests that studies regarding infants and young children are not normally relied upon in this area to form conclusions about adults. We do not conclude as a matter of law that such evidence is of a type reasonably relied upon by experts in the field. Rather, we reverse the district court's conclusion to the contrary as unsupported by the evidence available at the summary judgment stage of the proceedings below.

The opinion below also placed great weight on several of Ms. Mendes–Silva's answers in response to the government's request for admissions. First, the court noted that Ms. Mendes–Silva acknowledged that there were no reports in the medical literature "of any central nervous complication following the simultaneous administration of yellow fever and smallpox vaccine" or "of any adult sustaining diffuse disseminated encephalomyelitis following the simultaneous administration" of the two vaccines. *Memorandum Opinion* at 16. However, these admissions were subject to Ms. Mendes–Silva's explicit qualification that " 'simultaneous administration' refers to the administration *on the same day, at different sites,* of smallpox vaccine and 17D yellow fever vaccine." *Plaintiff's Response to Request for Admissions and Interrogatories* at 9, 10 (emphasis added). An admission that no such narrow study exists, duplicating both the "same day" and "different site" elements of this case, does not undermine the bases of the opinions of Ms. Mendes–Silva's experts. The district court also emphasized Ms. Mendes–Silva's admission that there was not, nor had there ever been, any biochemical or epidemiological test that could conclusively establish that one or both of the vaccines caused her illness. However, no such evidence is necessary to render an expert opinion admissible. As this Court stated in *Ferebee v. Chevron Chemical Co.,* "a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists." *Ferebee,* 736 F.2d at 1535. As long as the underlying bases and methods of the opinion are of a type reasonably relied upon by the experts in the field, "the fact that ... science would require more evidence before conclusively considering the causation question resolved is irrelevant." *Id.*

The district court erred in relying on our opinions in *Richardson v. Richardson–Merrell ("Richardson"),* 857 F.2d 823 (D.C.Cir.1988), and *Ealy v. Richardson–Merrell ("Ealy"),* 897 F.2d 1159 (D.C.Cir. 1990), to distinguish the *Ferebee* decision from the instant case. In *Richardson* and *Ealy,* this Court, employing the Rule 703 analysis reviewed earlier, held inadmissible expert opinion that the drug Bendectin caused the birth defects suffered by the plaintiffs' children. The *Richardson* Court distinguished *Ferebee* on the ground that it involved a new and tenable causation theo-

ry, whereas the theory in *Richardson* had been refuted by a wealth of epidemiological studies showing no statistically significant association between Bendectin and birth defects. More critically, the expert in *Richardson* himself acknowledged that the studies that he used were not of a type reasonably relied on by experts in the field. *Richardson*, 857 F.2d at 831. *See also Ealy*, 897 F.2d at 1161–62; *Ambrosini*, 966 F.2d at 1466–67. In direct contrast, Ms. Mendes–Silva's experts made no such concession, and the parties agree that no conclusive epidemiological studies exist. The district court's focus on language in *Richardson* and *Ealy* which distinguishes *Ferebee* as a case involving a causation issue on the "frontier of current medical and epidemiological inquiry," *see Richardson*, 857 F.2d at 832; *Ealy*, 897 F.2d at 1162, provides no basis for distinguishing *Ferebee* from this case. The district court assumes that a "stale" medical research subject, involving combined vaccinations administered some thirty years ago, cannot possibly be on the medical research "frontier." This conclusion is unwarranted for several reasons. First, *Richardson* and *Ealy* do not rely on an abstract temporal argument, but rather on the existence of a longstanding series of published epidemiological studies that were irreconcilable with the plaintiffs' theory. Again, the parties agree that no such contradicting epidemiological studies exist in this case. Second, the epidemiological question in this case *is* on the frontier of medical science in the sense that no clear answer has been found—research ceased when the question of the combined effect of the two vaccines was rendered moot in the scientific community by the eradication of smallpox. Thus, this case presents the same type of novel, yet properly grounded, medical conclusion that *Ferebee* held must be presented to the factfinder.

Dr. Bulle's partial reliance on a method of eliminating alternative causes for Ms. Mendes–Silva's illness is also insufficient to render his opinion inadmissible. The government's experts did not argue that such a method was not of a type reasonably relied upon to draw conclusions about medical causation. Rather, one expert, Dr.

Lane, suggested that the methodology was "inappropriate" because several possible causes of Ms. Mendes–Silva's illness might remain "uneliminated" even after a battery of tests is conducted. In an attempt to bolster his conclusion, Dr. Lane alluded to rare viruses as a possible alternative cause. This is nothing more than a challenge to the accuracy of Dr. Bulle's conclusion. Dr. Bulle gave specific testimony on his basis for ruling out viral causes and other explanations for the encephalomyelitis, and Dr. Lane suggested in response that alternative explanations for Ms. Mendes–Silva's illness nonetheless remained. The evaluation of these competing explanations presents "a classic battle of the experts, a battle in which the [factfinder] must decide the victor." *Ferebee*, 736 F.2d at 1529. *See also Richardson*, 857 F.2d at 832; *Ealy*, 897 F.2d at 1162; *Ambrosini*, 966 F.2d 1464.

The district court's opinion also relied heavily on an isolated comment that Dr. Bulle made in his deposition to conclude that his opinion was based on a "leap of faith" rather than scientific evidence. The district court stated that Dr. Bulle based his opinion on "the same logical faculty underpinning his belief that God exists," *Memorandum Opinion* at 15, relying on his deposition testimony that "we have no statistical evidence, but it is my strong belief that God exists because I cannot believe that everything that was created is there without a God. . . . It is one of those questions where one develops an understanding and a belief and acts accordingly." Legal opinions are not an apt place to explore religious conundrums about the basis for a belief in the Almighty, and we will resist the temptation to do so here. Suffice it to say that a fair reading of Dr. Bulle's entire deposition and the context of the statement in question indicates beyond a doubt that his opinion was based on far more than a leap of faith. The statement that the district court seized upon came at the conclusion of a long series of cross-examination questions discussing Dr. Bulle's attempt to "rule out" alternative causes and seeking to establish that Dr.

Bulle knew of no test or study conclusively establishing the link between the combined administration of yellow fever and small-pox vaccines and encephalomyelitis. Read in context, the statement appears to have served two specific purposes, neither of which calls into question the bases of Dr. Bulle's opinion. First, Dr. Bulle was acknowledging that no scientific evidence exists which *conclusively* establishes the causal link between the combined administration of the vaccines and encephalomyelitis. As noted earlier, this is no bar to the admissibility of his expert opinion on causation. Second, Dr. Bulle was making a reasonable, but somewhat recondite, analogy to describe the "rule out" method of medical diagnosis that Dr. Bulle partially relied on in this case. Dr. Bulle was simply comparing his conclusion regarding Ms. Mendes–Silva, insofar as it was based on the elimination of alternative explanations, to his belief in God, which he also appears to base on his elimination of alternative explanations for the physical world. If this were the only grounds on which Dr. Bulle reached his conclusion, the district court might have some basis for holding that his opinion was not based on the type of data and methods normally relied upon by experts in the field. However, placed in its proper context, and considered in conjunction with the various grounds for Dr. Bulle's conclusion, Dr. Bulle's isolated comment does not undermine the admissibility of his opinion.

Finally, the district court concluded that Dr. Bulle's reliance on contemporaneous medical literature counseling against the concurrent administration of the two vaccines was misplaced because those warnings arose out of a concern over effectiveness of the vaccines when administered together rather than the possibility of an encephalitic reaction. The district court's conclusion in this regard is fully supported by the record. However, this one deficiency in the basis of Dr. Bulle's opinion is not alone sufficient to support the district court's ruling that his opinion was inadmissible.

### B. *Sufficiency to Withstand Summary Judgment*

■ Having held that the district court erred insofar as it found the expert opinions of Drs. Bulle and Poser inadmissible, we must still address the separate inquiry as to whether the expert evidence is sufficient to create a genuine issue of material fact. In order to withstand the summary judgment motion, Ms. Mendes–Silva's experts " 'must set forth *specific facts* showing that there is a genuine issue for trial.' " *Ambrosini,* 966 F.2d at 1471 (emphasis in original) (quoting FED.R.CIV.P. 56). A review of their deposition testimony clearly demonstrates that both Dr. Bulle and Dr. Poser based their opinions on an array of specific sources and factual allegations. In *Ambrosini,* we held that an expert conclusion offered in a short affidavit and purportedly based on " 'the available scientific and epidemiological data' " and "a review of relevant medical records" of the plaintiff was sufficient to withstand summary judgment. *Ambrosini,* 966 F.2d at 1470. However, only preliminary discovery had been conducted in *Ambrosini* when the district court granted summary judgment. Ms. Mendes–Silva must be expected to make a greater showing here because discovery was virtually complete when the court granted the government's motion for summary judgment. *See id.* (noting that only preliminary discovery had been conducted and holding that the expert affidavit therefore "gave a sufficient factual basis to defeat summary judgment *at this point*") (emphasis added). In the instant case, the experts have founded their opinions on data and methods similar to those offered in *Ambrosini,* and those sources were discussed and debated in significant detail in the depositions. The district court's decision, insofar as it is founded on the insufficiency rather the inadmissibility of the evidence, improperly evaluates the credibility of witnesses and the weight of conflicting scientific arguments. These determinations must be left to factfinding, and are therefore inappropriate for the summary judgment stage of the proceedings.

## CONCLUSION

The district court erred in granting the government's motion for summary judgment. It was error to conclude that the opinions of Ms. Mendes–Silva's experts were inadmissible under Rule 703 because there was insufficient evidence on the record to support a finding that the evidence upon which they relied is not of the type reasonably relied upon by experts in the field. Furthermore, Drs. Bulle and Poser made specific factual allegations regarding causation and relied on specific scientific data more than adequate to withstand a motion for summary judgment.

 Ms. Mendes–Silva asks this Court to order that a new judge be assigned to the case on remand. Although we conclude that the district court erred in granting the government's motion for summary judgment, we do not believe that this case presents the type of extraordinary circumstances necessitating a direction that a new judge be assigned to the case on remand. The district judge did not inappropriately prejudge the issues nor otherwise indicate an inability to dispose fairly of this matter on remand. *See Bembenista v. United States*, 866 F.2d 493, 499 (D.C.Cir.1989). We also note that the district court did not have the benefit of our decision in *Ambrosini* at the time of its ruling. Although *Ambrosini* did not announce a change in the law, the opinion did clarify some of the knotty issues regarding the admissibility and sufficiency of expert medical evidence.

*Reversed and remanded.*