**Betsy LAKIE, Plaintiff,**

v.

**SMITHKLINE BEECHAM,
et al., Defendants.**

**Civil No. 93–0561 (HHG).**

United States District Court,
District of Columbia.

March 5, 1997.

Harvey S. Williams, Washington, DC, Michael G. Phelan, Cantor, Arkema & Edmonds, Richmond, VA, for Plaintiff.

Daniel W. Whitney, Howell, Gately, Whitney & Carter, Towson, MD, for Defendant SmithKline Beecham.

## Opinion

HAROLD H. GREENE, District Judge.

In this case, plaintiff claims to have suffered personal injuries as a result of her use of a denture adhesive, Orafix Special, sold and distributed by the defendants, Smith-Kline Beecham (SKB) and Norcliff–Thayer.[1]

### I

#### Facts

Mrs. Lakie is 68 years old. According to plaintiff, she began using Orafix Special in the spring of 1985. As a denture adhesive, Orafix Special is intended to be applied to the base of the denture before the denture is placed in the mouth. 21 C.F.R. § 872.3500(a). Plaintiff claims that she applied Orafix Special to the roof of her mouth at least every day, for most of the time twice a day. She stopped late in 1990 after learning that the product was being recalled by the Federal Drug Administration ("FDA") for benzene contamination.

In February of 1989 plaintiff was diagnosed with macrocytic anemia. She consulted Dr. Paul Swerdlow, a hematologist, in October of 1990. He diagnosed her condition as myelodysplastic syndrome ("MDS") 5 q-minus, a bone marrow disorder accompanied by a deletion in the long or "q" arm of the fifth chromosome. Her symptoms include a reduction in white blood cells (leukopenia), platelet levels (thrombocytopenia), and lymphocytes (lymphocytopenia).

MDS 5 q-minus is an extremely rare form of MDS—the incidence is estimated at 1 in 100,000 or perhaps as low as 1 in 1,000,000. In most cases its cause is unknown but it can occur spontaneously without exposure to a toxin. It is more common in women than in men, and occurs most frequently in people 60 or older. MDS can transform into leukemia and, in some cases, lead to death.

In her complaint plaintiff alleges claims of negligence, strict liability, breach of express and implied warranty, fraud, and failure to comply with FDA regulations. The defendant has filed two motions for summary judgment, which the plaintiff has opposed.[2] For the following reasons, both motions will be denied.

### II

#### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interroga-

---

1. SKB is the successor to the other named defendant, Norcliff–Thayer, Inc., which is no longer in existence. Accordingly, defendants will be hereinafter referred to singly.

2. The parties have also filed discovery related motions regarding, among other things, the magistrate judge's rulings. The Court will address these motions at a later date.

The Court will deny, however, defendant's motion to strike affidavits by Dr. Blanke and Dr. Swerdlow which were filed separately. The Court will consider these affidavits for the purposes of summary judgment. The affidavits have been sworn to under penalty of perjury, and they now comply with Local Rule 106(h). Furthermore the witnesses' statements in these affidavits merely clarify rather than contradict their earlier deposition testimony and do not create sham issues of disputed fact.

tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of summary judgment, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). In determining this, a court must draw all justifiable inferences in favor of the non-moving party. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 2434–2435, 115 L.Ed.2d 447 (1991). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law may the Court grant summary judgment. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510.

## III

### *Preemption*

■ The defendant first moves for summary judgment as to each count in the complaint on the basis that plaintiff's state law claims are preempted by the Medical Device Amendments ("MDA") to the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 321–394. Congress enacted the MDA in 1976 in order to regulate the safety and effectiveness of medical devices in the wake of injuries caused by the Dalkon Shield. *See* Robert S. Adler and Richard A. Mann, 59 Mo. L. Rev. 895, 910–11 (Fall 1994). Under the MDA and its implementing regulations, the FDA is required to classify each medical device intended for human use into one of three classes based on the level of risk the medical device presents. 21 U.S.C. § 360c(b)(1). Those that "present[ ] a poten-

tial unreasonable risk of illness or injury" are assigned to Class III. 21 U.S.C. § 360c (a)(1)(C).

Because Class III devices present the greatest risks, they are subject to premarket approval ("PMA") requirements. Each manufacturer is required to submit to the FDA extensive information which provides reasonable assurance of the safety and effectiveness of the medical device. *Id.* The PMA process is quite rigorous and time consuming; had Congress required that each device be submitted to this process thousands of devices would have had to be removed from the market at the time the MDA became law. To avoid this problem, Congress allowed companies to market a medical device "substantially equivalent" to a device already on the market if the companies submit to the FDA a so-called 510(k) notification.[3]

The MDA also contains a provision which preempts additional or inconsistent state requirements concerning the manufacture of medical devices. This section provides:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a)

Defendant claims that section 360(k) expressly preempts not only state statutes and regulations, but also state common law actions which by providing for the award of damages effectively establish requirements for medical devices different from or in addition to those imposed by the FDCA regulatory scheme.

---

**3.** Congress toughened these requirements in 1990, mandating that companies seeking market access through section 510(k) submit information about the safety and effectiveness of the device, including clinical data in some instances. 21 U.S.C. § 360c(i). If the device falls into Class III, the company submitting the 510(k) notification must certify to the FDA that it has conducted a search of and submitted all adverse information regarding the preenactment device and the device it seeks to market. *Id; see also* Adler & Mann, *supra,* at 915.

The Supreme Court recently addressed this precise issue. In *Medtronic, Inc. v. Lohr*, —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Court considered whether section 360k(a) applied to bar a claim for defective design of a Class III device which was exempt from the PMA process under section 510(k). A divided Court [4] held that Congress did not intend to bar state common law causes of action for injuries resulting from defective medical devices. The plurality held that, in enacting section 360k(a) Congress was "primarily concerned with the problem of specific, conflicting State statutes and regulations rather than the general duties enforced by common-law actions." *Id.* at ——, 116 S.Ct. at 2252. This includes state law claims for negligent or defective design and inadequate labeling. In fact the Supreme Court stated that "few, if any, common-law duties have been preempted by the [MDA]," unless the FDA specifically preempts them by regulation, the state cause of action is based on a state law that is device specific and different from or additional to federal requirements, or the state tort claim has the effect of establishing a substantive requirement for a specific device. *Id.* at ——, 116 S.Ct. at 2259.

The plurality noted that "[t]he presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute ..." when the duties these remedies enforce parallel federal requirements. *Id.* at ——, 116 S.Ct. at 2255. Thus state common law of general applicability is preempted only if the FDA has promulgated a specific federal requirement applicable to a particular device. *Id.* To interpret this section otherwise, the Court observed, would give the MDA the "perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation...." *Id.* at ——, 116 S.Ct. at 2251.

With these parameters in mind, the Court will deny the defendant's motion for summary judgment with respect to plaintiff's state law claims. Orafix Special was classified as a Class III device in 1987. 21 C.F.R. § 872.3500. However, Orafix Special was not subject to any specific FDA requirements regarding the product's benzene content. Thus this is not a case where "the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case ... and implemented that conclusion via a specific mandate on manufacturers or producers." —— U.S. at ——, 116 S.Ct. at 2258. *See, e.g., Papike v. Tambrands Inc.*, 107 F.3d 737, 741 (9th Cir.1997) (holding state law claims against tampon manufacturers preempted because FDA regulations mandated the "specific substantive content" of warnings regarding toxic shock syndrome).

Defendant reads *Lohr* as applying only to products which have received their market clearance through the 510(k) process. Defendant argues that a crucial basis for the Supreme Court's decision was the truncated nature of the "substantial equivalence" 510(k) process, which by definition is not as complete or rigorous as the PMA process. Since Orafix Special was commercially distributed before the enactment of the MDA in 1976, it was subject to the classification process set forth in 21 C.F.R. § 860.7. As a result, defendant contends *Lohr* does not apply.

In effect, defendant asks the Court to hold that the FDA's PMA process amounts to a "specific" federal requirement. Neither *Lohr* nor the MDA compel such a result. As the Ninth Circuit recognized, *all* Class III devices must undergo PMA and classification procedures before being sold in interstate commerce. *Kennedy v. Collagen Corp.*, 67 F.3d 1453, 1459 (9th Cir.1995), (citing 21 U.S.C. § 360(e); 21 C.F.R. § 814.1), *cert. denied*, —— U.S. ——, 116 S.Ct. 2579, 135

---

4. The plurality opinion, written by Justice Stevens, was joined by Justices Kennedy, Souter, and Ginsberg. Justice Breyer concurred in part in the opinion and concurred in the judgment. The remaining four Justices concurred in the finding that the common law defective design claims were not preempted, but dissented in part, concluding that the federal regulatory scheme regarding labeling and negligent manufacturing was sufficiently pervasive to preempt these types of common law claims.

L.Ed.2d 1094 (1996). The fact that the PMA process requires certain information and mandates certain procedures from manufacturers does not transform the PMA process *itself* into a specific federal requirement which triggers preemption and protects a manufacturer from suit. *Id.* To hold otherwise would be to create the very "perverse effect" the Court sought to avoid in *Lohr*, ⸺ U.S. at ⸺, 116 S.Ct. at 2251. "Premarket approval is supposed to benefit consumers, not create a rose garden, free from liability, for manufacturers." *Kennedy,* 67 F.3d at 1460.

Plaintiff's design defect and inadequate labeling claims, then, clearly are not preempted by the MDA. The laws under which she brings these as well as her negligence, fraud, and warranty claims are of general applicability, and were not enacted with respect to this, or any other, medical device. These laws apply to all products which may have caused injuries to its users. In addition, these laws do not conflict with a specific federal requirement related to the particular device of denture adhesives. *See, e.g., Committee of Dental Amalgam Manufacturers and Distributors v. Stratton,* 92 F.3d 807, 813 (9th Cir.1996) (holding state law claims not preempted since no specific FDA regulations on dental amalgams), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 754, 136 L.Ed.2d 690 (1997). Defendant's motion for summary judgment on this issue is denied.

## IV

### *Admissibility of Expert Testimony*

Plaintiff proffers the testimony of four expert witnesses, Doctors Paul S. Swerdlow, Thomas Callender, Charles E. Hess, and Robert V. Blanke, who conclude that her MDS 5 q-minus was caused by her exposure to the benzene in Orafix Special. Defendant argues that the opinions of these experts are inadmissible under the standards for scientific evidence established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Without this testimony plaintiff will be unable to meet her burden of proof on causation.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert,* the Supreme Court announced the criteria by which a trial judge should admit or exclude scientific evidence under Rule 702. The Court explained that Rule 702 requires the trial judge to act as a "gatekeeper" who assesses both the reliability and relevance of scientific evidence. 509 U.S. at 591, 113 S.Ct. at 2795–2796. The trial judge first inquires whether the proffered testimony is based on "scientific knowledge." *Id.* at 592, 113 S.Ct. at 2796. The judge evaluates whether "the reasoning or methodology underlying the testimony is scientifically valid" and whether it "properly can be applied to the facts in issue." *Id.* at 593, 113 S.Ct. at 2796.

Different factors influence whether such testimony constitutes scientific knowledge, including (1) whether the methodology has been tested; (2) whether it has been subjected to peer review; (3) the rate of error; and (4) the degree of general acceptance it enjoys in the scientific community. *Id.* at 593–594, 113 S.Ct. at 2796–2797. In the second stage of the *Daubert* analysis the court examines the relevancy of the scientific evidence, or whether it "fits" the material issues involved in the case. *Id.* at 591, 113 S.Ct. at 2795–2796.

█ As this Circuit recently made clear, this gatekeeping function does not permit a trial judge to pass on the merits of the expert's scientific conclusions. A trial judge must refrain from "evaluat[ing] the credibility of opposing experts and the persuasiveness of competing scientific studies...." *Ambrosini v. Labarraque,* 101 F.3d 129, 140 (D.C.Cir.1996). The court's only function is to ensure that the expert employed scientifically valid methodologies. Once this is clear, the opinions which follow from such reasoning and methodologies are admissible.

This Court is satisfied that in the instant case plaintiff's experts have employed scientifically valid methodologies and that their causation opinions qualify as scientific knowledge. In arguing to the contrary, defendant confuses, at times ignores, the crucial distinction between the *admissibility* of expert scientific testimony and the *weight* such testimony should be afforded by the trier of fact.

█ Dr. Swerdlow is a hematologist who first treated plaintiff in 1989 and later diagnosed her MDS 5 q-minus. Dr. Thomas James Callender is a clinical physician and researcher who specializes in occupational and environmental toxicology. Plaintiff consulted him in 1993. He has treated hundreds of patients exposed to benzene. Dr. Charles E. Hess is a clinical and research physician at the University of Virginia Medical Center who specializes in hematologic malignancies, including leukemia and myelodysplastic syndromes. He has been treating the plaintiff since May of 1995. Dr. Hess has treated hundreds of patients with MDS and related disorders.

All three medical doctors employed a "differential diagnosis" methodology in reaching their opinion that the plaintiff's MDS 5 q-minus was caused by her exposure to benzene from Orafix Special. This methodology involves first identifying possible causes of a patient's symptoms and then differentiating among them. Thereafter other possible causes are sought to be ruled out, usually through further examination and laboratory tests. Drs. Swerdlow and Hess stated that their causation opinions were based on examination of the plaintiff's medical history, the lack of other causative agents such as direct exposure to radiation or pesticides, and a review of medical literature connecting exposure to benzene to bone marrow disorders like MDS and leukemia.[5]

The reliability of this methodology is well established. In a similar case, the Fourth Circuit recently affirmed the admission of expert testimony based on this methodology. *Benedi v. McNeil–P.P.C. Inc.*, 66 F.3d 1378, 1384 (4th Cir.1995). In *Benedi*, the plaintiff alleged that use of Tylenol in combination with regular alcohol consumption caused his severe liver damage. He sued the manufacturer under negligent failure to warn and implied warranty theories. The Fourth Circuit affirmed the district court's admission of the testimony of treating physicians who based their causation opinions on the appearance of the plaintiff's liver, the amount of Tylenol found in his blood, his medical history and regular use of alcohol, review of medical literature, and the absence of any other apparent cause of plaintiff's liver failure. *Id.* "In light of the medical community's daily use of the same methodologies in diagnosing patients," the Fourth Circuit refused to find that this methodology was unreliable or unsound. *Id.*

Dr. Swerdlow is a specialist in hematology, Dr. Callender has created hundreds of patients exposed to benzene, and Dr. Hess has treated numerous patients with MDS.[6] Before litigation commenced all three were familiar with the medical literature which establishes a strong correlation between benzene exposure and the occurrence of bone marrow disorders such as aplastic anemia, acute leukemia, and MDS. In fact, all the experts in this case, including defendant's, have acknowledged that it is accepted in the medical community that in sufficient doses benzene is a bone marrow toxin.[7]

Although somewhat disputed, there is also evidence that the mechanisms of develop-

---

**5.** Dr. Callender outlined more specifically how to establish causation using the scientific method:

(1) the chemical in question is capable of producing the medical condition;
(2) the exposure was of sufficient magnitude to produce the condition;
(3) the chemical exposure was temporally related to the onset of the condition;
(4) alternative causes are ruled out; and
(5) there is coherency and consistency in the evidence in the particular case.

**6.** It is also important, although not dispositive, that all three experts have strong credentials. Courts often view such credentials as "circumstantial evidence" that the experts used a scientifically sound methodology in forming their opinions. *See Ambrosini*, 101 F.3d at 140 (citations omitted).

**7.** It is textbook knowledge that "[b]enzene, in particular is known to induce MDS as well as leukemia." *Wintrope Clinical Hematology*, 9th Edition, Second Volume, at 1949.

ment for MDS and leukemia are very similar, if not identical. It is not clear exactly how benzene causes leukemia or MDS. However it is known that benzene is metabolized in the liver and the metabolites are distributed throughout the body. Other substances in the body absorb these metabolites and can destroy genetic material in the bone marrow. With MDS, this damage results in abnormal production and maturation of red and white blood cells but not a complete destruction of bone marrow as in leukemia. Dr. Swerdlow stated that since the types of biochemical lesions which cause leukemia are very similar to the lesions which cause MDS he would expect that what causes one lesion would cause the other. Drs. Swerdlow and Hess also claimed that a significant percentage (10–30%) of leukemia patients undergo a myelodysplastic syndrome before they progress to leukemia. Dr. Swerdlow predicted that this transformation would be even more prevalent in benzene-induced leukemia because the myelodysplastic syndrome stage has passed unnoticed by the time the leukemia is diagnosed.[8]

The plaintiff's causation theory, then, is a far cry from the theories advanced by plaintiffs in the Benedictin cases where an "overwhelming" body of evidence contradicted the experts' conclusions. *See Raynor v. Merrell Pharmaceuticals Inc.*, 104 F.3d 1371, 1375–1377 (D.C.Cir.1997) *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir. 1988), *cert. denied*, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989). In the instant case, the weight of scientific evidence connecting benzene and MDS supports rather than contradicts the doctors' opinions that benzene causes MDS 5 q-minus.

To avoid this result, defendant returns to the same argument again and again—that there is no established evidence demonstrating a causative link between benzene exposure and MDS 5 q-minus. The absence of epidemiological studies, however, while important, is not dispositive as long as the methodology employed by the expert is sound. *Benedi*, 66 F.3d at 1384; *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1536 (D.C.Cir.) ("a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that ... such a relationship exists"), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

This is especially true when the disease is an extremely rare disorder like MDS 5 q-minus. For one, MDS 5 q-minus has not been included in any of the epidemiological studies on benzene exposure. Furthermore, MDS and MDS 5–q minus have only recently been identified as separate medical conditions.[9] Plaintiff's experts did consider, however, published case reports and prospective studies which found a statistically relevant correlation between benzene exposure and MDS.[10]

Defendant also argues that these opinions are inadmissible because the doctors have not published their views in peer reviewed journals. The Supreme Court in *Daubert* declared the fact of peer review and publication a "pertinent" factor in the gatekeeping inquiry. 509 U.S. at 593, 113 S.Ct. at 2796–2797. The Supreme Court wrote that "submission to the scrutiny of the scientific community is a component of good science" but recognized that "[s]ome propositions ... are too particular, too new, or of too limited interest to be published." *Id. See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

---

8. Defendant spends considerable time attacking this conclusion, arguing repeatedly that plaintiff does not fit the profile of a "secondary" MDS 5 q-minus patient who will transform to leukemia. Once again, defendant's arguments speak to the weight of the doctors' testimony, not its admissibility. The Court will not deem the opinions of Drs. Swerdlow and Hess inadmissible on this basis since they have shown a reliable and scientific support for their conclusions.

9. Until the 1980s, MDS and other disorders were referred to as "pre-leukemia."

10. Dr. Swerdlow referred specifically to a study by Lois Travis in Leukemia Lymphoma, Volume 14, published by the Epidemiology and Biostatistics Program of the National Cancer Institute. The study compared 74,828 workers employed in China between 1972 and 1987 who were exposed to benzene to 35,000 similar workers who were not exposed. The study found seven more cases of MDS in the exposed workers than in the unexposed workers.

43 F.3d 1311, 1318 n. 9 (9th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). Again MDS 5 q-minus is a rare and relatively newly discovered condition and it is not surprising—nor probative of its scientific validity—that the experts' theories have not been published. Moreover the experts' findings flow directly from research connecting benzene and MDS—research which has been exhaustively published and peer reviewed. It is not dispositive, then, that these scientific opinions have not been published.

■ Nor is it particularly significant that the doctors could not affirmatively eliminate spontaneous chromosomal mutation as a cause of plaintiff's MDS 5 q-minus. The differential diagnosis methodology, based on the scientific method, requires that alternate causes of the condition be eliminated. However, an expert must not eliminate each and every possible alternative cause. This is especially true when a plaintiff can establish general causation, or a definitive "link" between the causative agent and the condition it allegedly produced. *Raynor v. Merrell Pharmaceuticals Inc.,* 104 F.3d at 1375–1377. This burden would be particularly onerous in this case given that spontaneous chromosomal mutation is a difficult phenomenon for scientists to understand. "The fact that several possible causes might remain 'uneliminated' ... only goes to the accuracy of the conclusion, not the soundness of the methodology." *Ambrosini,* 101 F.3d at 140 (citing *Mendes–Silva v. United States,* 980 F.2d 1482, 1487 (D.C.Cir.1993)). This plaintiff has established that there is a clear link between benzene contamination and MDS. As a result, it is not fatal to the admissibility of plaintiff's experts' testimony regarding specific causation that her experts cannot eliminate every possible cause of her condition.

■ Defendant also takes issue with the scientific opinion of Dr. Paul S. Blanke, the "dosage" expert. Dr. Blanke is the former Director of the Toxicology Laboratory of the Medical College of Virginia Hospitals and Professor of Pathology, Pharmacology and Toxicology in the Schools of Medicine and Basic Sciences of Virginia Commonwealth University. He calculated that the dosage of benzene which plaintiff absorbed over the six year period was between 550 to 4200 mg. He also determined that this level of exposure was sufficient to cause plaintiff's disease. All three of plaintiff's experts relied on these results in diagnosing benzene as the cause of plaintiff's MDS 5 q-minus.

Plaintiff provided Dr. Blanke with two tubes of Orafix Special, which he sent for laboratory tests conducted by Dr. Joseph Saady. Lab results indicated that one tube of Orafix Special contained 110 parts per million ("ppm") of benzene and the other contained 230 ppm. Dr. Blanke had to revise his first set of calculations when he discovered that he had used the wrong tube sizes. In his revised calculations, Dr. Blanke assumed that plaintiff applied the entire contents of a 2.4 ounce tube of Orafix Special twice a day for a period of 25 days. Based on her claims that she applied the denture adhesive twice a day 90% of the time, he estimated the days of use from January of 1985 until four different stopping points. He then estimated the grams of benzene plaintiff was exposed to during each of the four time periods and how much benzene plaintiff would have absorbed, assuming gradually increasing levels of benzene in the product. He assumed eight different benzene values (in parts per million): 162, 200, 300, 350, 450, 600, and 750.

Dr. Blanke followed the reasoning and methodology required of a toxicologist. The Federal Judicial Center has outlined the role of a toxicologist in clinical poisoning cases:

> First, the toxicologist should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption in the body. Finally, the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease.

*The Reference Manual on Scientific Evidence* (1994), at 201.

Dr. Blanke stated that he reviewed plaintiff's medical background and history, and examined the plausibility of the relationship between benzene exposure and MDS. In de-

termining the amount of benzene plaintiff absorbed through her mouth, Dr. Blanke relied on animal studies which showed almost complete absorption when benzene was applied to the skin. Because gum tissue is more vascular than skin tissue, Dr. Blanke concluded that there would be less resistance to absorption at the gums and mouth than when the substance was placed directly on skin.

In addition, Dr. Blanke grounded his assumed benzene values not on arbitrary criteria but on verifiable information regarding Orafix Special's benzene content. This included data contained in defendant's internal documents, data provided during the depositions of defendant's corporate representative Dennis Huston and defendant's expert John Jacobus, and independent FDA tests. For example, John Jacobus testified in his deposition that the average benzene content of five lots of Orafix Special was 162 ppm. FDA laboratory tests on certain samples of Orafix Special found 191 ppm. The higher end of the range was based on different concentrations of Gantrex S–97, an ingredient of Orafix Special. Although defendant may dispute these values, and will no doubt challenge them at trial, they are not the kind of unsupported assumptions or arbitrary speculations which are inadmissible under *Daubert.*

Defendant challenges Dr. Blanke's testimony for several other reasons, most of which plainly have no merit and which the Court therefore will not address here. One contention, however, bears a brief discussion. Defendant attacks Blanke's opinion because the benzene content of Orafix Special varied from lot to lot, depending on the year of manufacture and other variables, and he "had no evidence of the precise amount of benzene in each tube or Orafix Special that Ms. Lakie used over the years." Def. Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 2.

The law does not hold the plaintiff to such an exacting standard of proof. Plaintiff cannot prove the exact content of benzene in each tube of Orafix Special. But this would be impossible since she used the product almost ten years ago and it no longer exists in the same form. Plaintiff has offered, however, reliable evidence of the dosage of benzene she absorbed from her use of Orafix Special. This distinguishes this case from those in which expert scientific testimony was excluded because there was *no* credible information regarding dosage. *See, e.g., Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992). In this case plaintiff saved almost all of her proofs of purchase for Orafix Special. Dr. Blanke based his calculations on this information, following an established scientific methodology and basing his dosage calculations on sound factual and scientific grounds. His expert testimony is clearly admissible under *Daubert.*

In sum, the Court cannot conclude as a matter of law that the scientific testimony of plaintiff's experts is unreliable and inadmissible. "[W]hen a court denies the right to have a jury decide a disputed issue, especially one of a scientific nature, its reasons for doing so must be strong." *Ambrosini v. Labarraque,* 966 F.2d 1464, 1469 (D.C.Cir.1992). The reasons advanced by defendant simply are not enough to justify entering summary judgment against the plaintiff. In essence, defendant asks the Court to engage in the very inquiry *Daubert* and its progeny forbid. Defendant can challenge the weight and sufficiency of this evidence at trial, but the substance of the experts' opinions, or the relative superiority of defendant's own evidence, is for the jury, not the Court.

## V

### Choice of Law

Defendants have also moved for summary judgment on the counts in the complaint alleging strict liability, fraud and misrepresentation, breach of warranty, and punitive damages.

The Court must first determine which State substantive law applies to plaintiff's claims. Sitting in diversity, the Court must apply the choice of law rules of the District of Columbia. *GEICO v. Fetisoff,* 958 F.2d 1137, 1141 (D.C.Cir.1992). The District of Columbia uses a modified "governmental

interest" analysis to resolve the choice of law issue. *Doe v. Roe,* 841 F.Supp. 444, 446 (D.D.C.1994). This analysis requires the Court to "evaluate the governmental polices underlying the applicable conflicting laws and to determine which jurisdiction's policy would be most advanced by having its law applied ..." *Williams v. Williams,* 390 A.2d 4, 5–6 (D.C.1978). The District of Columbia looks to the Restatement (Second) of Conflicts of Law for guidance. The Restatement lists four factors for a court to consider: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile or place of business of the parties; and (4) the place where the relationship between the parties is centered. Restatement § 145(2).

 Defendant argues, correctly, that Virginia law applies to plaintiff's claims. Plaintiff is a resident of Virginia, and during 1985 through 1990 she purchased and used Orafix Special in Virginia. The only connection between this action and the District of Columbia is that defendant conducts business in the District, as it does in many other states. Although the District has abandoned a strict "place of the injury" test, under its "governmental interest" analysis a state's interest in the application of its law is strongest when both the place of the injury and the domicile of the plaintiff are within its territory. *Doe v. Roe,* 841 F.Supp. at 447 (citing *Gaither v. Myers,* 404 F.2d 216, 223 (D.C.Cir. 1968)). Nor does the District have an interest in applying its own law, given that neither party is a resident and no tortious conduct occurred here. Virginia law, then, will apply to plaintiff's claims.

Accordingly, plaintiff cannot bring her claims alleging strict liability. It is clear that Virginia does not recognize a cause of action for strict liability in tort. *See e.g., Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 57–58 n. 4 (1988).[11] Thus the Court will grant defendant summary judgment with respect to Count V.

The Court will deny defendant's motion for summary judgment with respect to the other Counts in the complaint, specifically plaintiff's allegations of fraud, misrepresentation, and breach of warranty. These claims—which are recognized under Virginia law—present genuine issues of material fact concerning reliance which preclude a grant of summary judgment. Defendant has not come close to meeting its burden of showing that the undisputed facts demonstrate that plaintiff failed to rely on representations of safety. Nor will the Court rule on plaintiff's punitive damages claim at this time.

---

11. Virginia law would allow an action for strict liability for damages caused by "abnormally dangerous activities" such as blasting. *See Richmond, Fredericksburg & Potomac v. Davis Ind.,* 787 F.Supp. 572, 575 (E.D.Va.1992). However, this activity must be the type which cannot be made safe with reasonable precautions. *Philip* *Morris v. Emerson,* 235 Va. 380, 368 S.E.2d 268, 282 (1988) (holding that handling pentaborane, a toxic chemical, not abnormally dangerous activity). Obviously, the use of a denture adhesive cannot be considered abnormally dangerous under this standard.